UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
UNITED STATES OF AMERICA,

                                           <u>MEMORANDUM & ORDER</u>
          -against-                        06-CR-0550(JS)


SANDRA HATFIELD and DAVID H. BROOKS,

                    Defendants.
----------------------------------------X
APPEARANCES
For Government:     James Halleron Knapp, Esq.
                    Richard Thomas Lunger, Jr., Esq.
                    Christopher Charles Caffarone, Esq.
                    Christopher Allen Ott, Esq.
                    James M. Miskiewicz, Esq.
                    Kathleen Anne Nandan, Esq.
                    Marshall L. Miller, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    610 Federal Plaza
                    Central Islip, NY 11722


For Defendants:
Sandra Hatfield     Maurice H. Sercarz, Esq.
                    Roland G. Riopelle, Esq.
                    Sercarz & Riopelle
                    152 West 57th Street, 24th Floor
                    New York, NY 10019

                    W. Thomas Dillard, Esq.
                    Ritchie, Dillard & Davies, P.C.
                    606 W Main Street, Suite 300
                    Knoxville, TN 37902

David Brooks        Kenneth Ravenell, Esq.
                    The Murphy Firm
                    One South Street, 23rd Floor
                    Baltimore, MD 21202

                    Roger V. Archibald, Esq.
                    16 Court Street, Suite 2400
                    Brooklyn, NY 11241

                    David M. Goldstein, Esq.
                    David M. Goldstein, P.A.

286 NE 39th Street
Miami, FL 33137

Gerald L. Shargel, Esq.
Law Office of Gerald Shargel
570 Lexington Avenue
New York, NY 10022

Ira Lee Sorkin, Esq.
Dickstein Shapiro
1177 Avenue of the Americas
New York, NY 10036

James M. LaRossa, Esq.
200 East 64th Street, Apt 14D
New York, NY 10065

Jeffrey H. Lichtman, Esq.
Law Offices of Jeffrey Lichtman
750 Lexington Ave, 15th Floor
New York, NY 10022

John C. Meringolo. Esq.
Meringolo and Associates, P.C.
375 Greenwich Street, 7th Floor
New York, NY 10013

Judd Burstein, Esq.
Judd Burstein, P.C.
1790 Broadway, Suite 1501
New York, NY 10019

Laurence S. Shtasel, Esq.
Blank Rome LLP
The Chrysler Building, One Logan Square
Philadelphia, PA 19103

Mauro Michael Wolfe, Esq.
Duane Morris LLP
1540 Broadway
New York, NY 10036

Richard Ware Levitt, Esq.
Levitt & Kaizer
40 Fulton Street, 23rd Floor
New York, NY 10038

Yvonne Shivers, Esq.
Law Offices of Richard Ware Levitt
148 East 78th Street
New York, NY 10075

Zaki I. Tamir, Esq.
Gofer Tamir and Associates
55 Broad Street, 26 Floor
New York, NY 10004

SEYBERT, District Judge:

Pending before the Court is the Government's motion to enter a preliminary order of forfeiture against Defendants David H. Brooks and Sandra Hatfield and the supplemental briefing and calculations of the parties in response to this Court's June 14, 2011 Memorandum and Order ("June 14 Order"). For the following reasons, the Government's motion is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

In October 2007, the Government charged Brooks and Hatfield with numerous crimes, including securities fraud, mail fraud, and wire fraud. In connection with this prosecution, the Court restrained numerous bank accounts as potentially subject to criminal forfeiture. The Court also issued seizure warrants directed at various pieces of personal property, including three automobiles, 6,007,099 shares of Point Blank Solutions, Inc., gold watches, designer pens, and a jewel-encrusted American flag belt buckle.

On September 14, 2010, a jury convicted Brooks on counts 1-11 and 15-17 of the Indictment, including all counts that alleged securities fraud, mail fraud, wire fraud, and/or conspiracy to commit those crimes. The jury convicted Hatfield on counts 1-3 and 12-16 of the Indictment, but acquitted her on counts 4-5. In so doing, the jury convicted Hatfield on all counts that alleged securities fraud and conspiracy to commit securities, mail and wire fraud. But it acquitted her on the direct mail and wire fraud counts.

The parties agreed to waive their rights to a jury trial on forfeiture. So, in November 2010, the Court conducted protracted non-jury forfeiture proceedings. It then permitted the parties to submit lengthy post-hearing briefs, with reply submissions not coming in until April 14, 2011.

On June 14, 2011, this Court issued a Memorandum and Order granting in part and denying in part the motion to enter a preliminary order of forfeiture. United States v. Hatfield, __ F. Supp. 2d __, 2011 WL 2446430 (E.D.N.Y. June 14, 2011). The motion was granted to the extent that it sought forfeiture of assets that Brooks obtained through the unauthorized compensation scheme, id. at *20, and the motion was denied to the extent that it sought forfeiture of the $94,000 paid to WGH Consulting, id. at *24. The motion was also denied to the extent that it sought forfeiture of the alleged insider trading

4

proceeds in their entirety, id. at *2-5; however, the Court held that a least a portion of both Brooks' and Hatfield's alleged insider trading proceeds were forfeitable and reserved judgment as to the exact dollar amount pending revised calculations and supplemental briefing, id. at *20.

Specifically, this Court (1) ordered the Government's expert, Professor Harris, to recalculate forfeiture using only his discounted cash flow and P/E studies and omitting the PACA inventory fraud from those calculations, id. at *17, 18, 20, and (2) requested that the parties submit supplemental briefing on how to proceed with respect to Items 106 to 113 listed in Appendix I of the Government's post-trial brief (Docket No. 1422-2), id. at *24.

On July 11, 2011, the Government submitted supplemental briefing and Professor Lawrence Harris's revised calculations. (Gov't Ltr., Docket No. 1459.) Professor Harris stated that he made five changes to the assumptions previously made in the discounted cash flow study, but that only the first three were "necessary to take into account the Court's instruction that the PACA inventory fraud should not be used to estimate ill-gotten gains." (Harris Supp. Aff. ¶ 3, 7, 8.) Additionally, Professor Harris stated that he made two changes to the P/E assumptions, both necessary to exclude the PACA inventory fraud from his estimate. (Id. ¶¶ 11-12.) As for the

items of personal property, the Government asserts that they should be liquidated and the proceeds from the sale of each item should be divided on the same pro rata basis as the cash and investment accounts. (Gov't Ltr. at 2-4.)

On July 15, 2011 Defendant Brooks submitted a letter, joined by Defendant Hatfield, stating the "the Court erred in reopening the record to allow the Government to file a new expert report," and asking the Court to strike the Government's July 11, 2011 submission and rule that there should be no forfeiture on the insider trading accounts. (Brooks Ltr. at 1, Docket No. 1460.) On July 18, 2011, the Court denied Defendants' requests but stated that it "will consider the arguments in their letter in resolving the outstanding forfeiture issues after all supplemental briefing regarding forfeiture is complete." (Order at 2, July 18, 2011, Docket No. 1464.)

Defendant Brooks submitted his opposition on July 27, 2011 (Brooks Opp., Docket No. 1467) and Defendant Hatfield submitted her opposition on July 29, 2011 (Hatfield Opp., Docket No. 1469). They argue that Professor Harris's supplemental report must be stricken in its entirety for failing to comply with the Court's June 14 Order and for incorporating unscientific assumptions. Brooks argues that this warrants dismissal of all insider trading forfeiture claims. Hatfield

argues in the alternative that the Court should require Professor Harris to again recalculate based on the directives in the June 14 Order.

The Court agrees with Defendants that dismissal of the insider trading forfeiture claims is warranted as the Government has failed to meet its burden. However, this does not impact this Court's prior ruling regarding forfeiture of assets related to the unauthorized compensation scheme. Therefore, for the following reasons, the Government's motion is GRANTED IN PART AND DENIED IN PART.

DISCUSSION

I.    Standard of Review

The Government seeks forfeiture under 18 U.S.C. § 981(a)(1)(C), which authorizes forfeiture of "[a]ny property . . . which constitutes or is derived from proceeds traceable to" many kinds of offenses, including securities fraud. 18 U.S.C. § 981(a)(1)(C). "Because criminal forfeiture is viewed as part of the sentencing process, the government need prove facts supporting forfeiture only by a preponderance of the evidence." United States v. Gaskin, 364 F.3d 438, 461 (2d Cir. 2004) (internal citations omitted).

"The calculation of forfeiture amounts is not an exact science." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011). Thus, "[t]he court need not establish the loss with

precision but rather need only make a reasonable estimate of the loss, given the available information." _Id._ (internal quotation marks and citations omitted). And, consequently, the Court "is permitted to use general points of reference as a starting point for calculating the losses or gains from fraudulent transactions and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." _Id._

II. Insider Trading

As explained above, the Court previously held that at least a portion of both Brooks' and Hatfield's alleged insider trading proceeds were forfeitable--the difference between the stock's inflated value and what it would have been sold for absent the fraud. See United States v. Hatfield, 2010 WL 1685826, at *3 (E.D.N.Y. Apr. 21, 2010); Hatfield, 2011 WL 2446430, at *5. The Government was, therefore, required to prove, by a preponderance of the evidence, what Defendants' shares would have sold for absent the fraud.

After a protracted trial and a review of post-trial submissions, the Court held that the Government failed to meet that burden because its analysis improperly considered the PACA fraud and reserved judgment pending supplemental calculations and briefing to correct that error. In so doing, the Court rejected Professor Harris's event-driven studies and ordered the

supplemental calculations with respect to only the discounted cash flow method and P/E studies.

A.    Government Failed to Satisfy its Burden

In response to the Court's June 14 Order, the Government filed a supplemental affidavit from Professor Harris in which he revised his forfeiture calculations. (Harris Supp. Aff. ¶ 1.) Professor Harris explains that the "[m]ost significant[]" changes were made to "exclude any price inflation attributable to the PACA inventory overstatement from [his] calculation of the ill-gotten gains." (Id. ¶ 2.) With respect to the discounted cash flow method, those changes involved: (1) revising his calculation of "corrected earnings" to specifically exclude the effect of the PACA fraud (id. ¶ 4); (2) lowering the short-run expected growth rate to reflect the fact that, given true information about DHB's earnings and gross profit margins, investors would have expected a lower short-run growth rate (id. ¶ 5); and (3) adjusting the corrected stock price return on December 23, 2004 to exclude the effect of the PACA fraud (id. ¶ 6). With respect to the P/E study, those changes involved: (1) revising his calculation of "corrected earnings" to specifically exclude the effect of the PACA fraud (id. ¶ 11); and (2) lowering the computed market P/E ratio to reflect the fact that given true information about DHB's earnings and gross profit

margins, DHB common stock would have commanded a lower P/E ratio (id. ¶ 12).

In addition, Professor Harris made two changes to his discounted cash flow study "not associated with the exclusion of the PACA fraud" (id. ¶¶ 7-8): (1) he increased the applicable discount rate (id. ¶ 7); and (2) he accounted for the actual return of DHB common stock on non-fraud days between the valuation date and the dates of the insider sales (id. ¶ 8).

The Court finds that the Government has failed, yet again, to meet its burden of establishing ill-gotten gains by a preponderance of the evidence because Professor Harris's updated report makes assumptions and adjustments to the discounted cash flow study outside the limited discretion granted to him by the Court's June 14 Order, and these revisions are based on the same type of subjective opinions that the Court rejected in refusing to consider the results of the event-driven studies.

The Court's June 14 Order could not have been more clear:  "the Court . . . order[ed] the Government and Professor Harris to provide revised calculations that apply the same methodology, but do not 'correct' for a PACA fraud that had yet to occur."  Hatfield, 2011 WL 2446430, at *17-18 (emphasis added).  The Court allowed Professor Harris to "use his reasoned judgment" in deciding how best to exclude the PACA fraud from his analysis and stated that it will use his revised calculation

to order forfeiture. Id. at *17. However, Professor Harris's supplemental report does more than correct for the PACA fraud; he changed his methodology in two ways "not associated with the exclusion of the PACA fraud." (Harris Supp. Aff. ¶¶ 7-8.)

First, Professor Harris changed the applicable discount rate from 11.48% to 13.98% because the Court stated that it was "if anything, much too conservative." (Id. ¶ 7 (quoting Hatfield, 2011 WL 2446430, at *17).) This statement was not a directive to increase the applicable discount rate; rather, it was the Court's response to Defendants' criticism of that rate. Nowhere, as Professor Harris suggests, did the Court "ask[] [him] to revise [his] estimate of the discount rate." (Id.)

Aside from not having authority to make such a change, the Court cannot credit the basis for the change. Professor Harris initially arrived at 11.48% by working backward from the closing price of DHB's stock--i.e. "the fact that DHB's stock traded as specific levels implies that the market determined an 11.48% discount rate." Hatfield, 2011 WL 2446430, at *16 n.15. The Government argued that this rate--11.48%--was reasonable given the median estimates of discount rates for firms in DHB's industry as reported by the Ibbotson Cost of Capital 2005 Yearbook. (Gov't Post-Trial Br. at 43-44 & n.22, Docket No. 1422.) The Court accepted Professor Harris's rationale and the

use of an 11.48% discount rate.  Professor Harris has now raised
that discount rate by more than 20% (2.5 percentage points) and
provides no rationale for doing so; he merely states that the
higher rate was warranted "based on [his] expertise."[1]  The Court
repeatedly stated in the June 14 Order that such "gut-based"
assumptions not based on any objective analysis will not be
credited.  Hatfield, 2011 WL 2446430, at *14.  Thus, the Court
similarly rejects this new discount rate.

Second, Professor Harris adjusts his discounted cash
flow study to "consider factors that impacted DHB's stock price,
but bore no relation to the frauds."  (Harris Supp. Aff. ¶ 8
(quoting Hatfield, 2011 WL 2446430, at *15).)  He admits again
that this change had nothing to do with the exclusion of the
PACA inventory fraud.  (Id.)  Rather, it was made in response to
the Court's criticism of the forward-looking event study (id.)[2]
and in direct contradiction to the Court's directive to "apply

[1] Professor Harris also states that the 13.98% rate is reasonable
and appropriate based on the same median estimate reported by
Ibbotson that the Government used to support the reasonableness
of an 11.48% rate.  (Harris Supp. Aff. ¶ 7; Gov't Post-Trial Br.
43-44 & n.22.)  The Court  will not credit this assertion as the
median estimate cannot provide the basis for both an 11.48% rate
and a 13.98% rate.
[2] The Court rejected the forward-looking event study, in part,
because it considered only 16 days in a 421 day period, and "by
excluding those 405 days . . . Professor Harris failed to
consider factors that impacted DHB's stock price, but bore no
relation to the frauds."  Hatfield, 2011 WL 2446430, at *15.

the same methodology" in revising his calculations, <u>Hatfield</u>, 2011 WL 2446430, at *17.

Again, aside from making the change in violation of the Court's June 14 Order, the Court cannot accept the substance of the change. Professor Harris's only explanation for the source of and rationale for the adjustment is as follows:

> In recognition of the fact that DHB's true value estimate would also likely be impacted by non-fraud-related factors, I made the necessary adjustment to the Discounted Cash Flow study by accounting for the actual return of DHB common stock on non-fraud-related days between the valuation date of the Discounted Cash Flow study and the dates of the insider sales.

(Harris Supp. Aff. ¶ 8.) Exhibit 4 of Professor Harris's supplemental affidavit shows that he adjusted the excess return on November 15, 2004 by 50%--this appears to be the same 50% adjustment that he made in his forward-looking event study to factor in a November 15, 2004 favorable Schaeffer's Investment Research Report on DHB.[3] The Court, however, rejected the forward-looking event study, in part, because of this very adjustment:

> Professor Harris did not derive the 50% figure from any kind of objective analysis, such as a statistical study. Instead, he admitted that the 50% adjustment emerged

---

[3] The Court notes that neither Professor Harris's affidavit nor the Government's letter explains these or any of the other calculations reflected in the Exhibits attached to the supplemental affidavit.

> from his "gut." Professor Harris also
> admitted that these adjustments followed no
> generally accepted method, because "to the
> best of my knowledge, there is no generally
> accepted method" as "these are studies that
> are not generally done."

Hatfield, 2011 WL 2011 WL 2446430, at *14 (quoting Tr. 50, 282).

The Court will not accept such "gut-based" assumptions made in

contravention of its own Order.

Defendants also object to (1) Professor Harris's use

of figures drawn from DHB's SEC filings and (2) the 25%

adjustment to the computed market P/E ratio. The Court will

briefly address these two issues. First, as for the use of SEC

filings, the Court, in its June 14 Order, expressly stated that

"[t]he Government chose to seek forfeiture based on the

Indictment's allegations, not the restatement's conclusions.

Quite frankly, this strategic choice surprised the Court. But

the Government is stuck with its decision." Hatfield, 2011 WL

2446430, at *18. The Court agrees with Defendants that

Professor Harris is barred from relying on the 2007 restated

financials. However, it does not appear that Professor Harris's

revised calculations incorporate any figures from the

restatement; rather, he incorporates some figures from 10-Qs

filed in 2004--which are the figures reflected in the

Indictment.

Second, Defendants object to Professor Harris's adjustment to the P/E ratio. In his original analysis, Professor Harris reduced the P/E ratio by 30%. The Court heavily criticized the 30% discount because (1) it was not based on any statistical analysis and (2) he failed to explain why the P/E ratio deserved a steeper discount than the discounted cash flow study (where the short terms earnings growth rate was dropped by only 20.68% and the discount rate was left intact). Id. at *18. The Court, although hesitant to do so, ultimately accepted the 30% reduction.[4] In his updated calculations, Professor Harris applies a 25% reduction and states that this "estimate" is based on his "expert opinion" of how the P/E ratio would have been affected by the fact that: "(a) earnings would have been approximately 9 cents lower than the actual reported numbers (as opposed to 16 cents lower if one were to take into account the PACA inventory fraud); and (b) the PACA inventory

_____

[4] The Court stated that "several factors tip towards the Court not rejecting" the P/E study: (1) the Government's burden is only a preponderance of the evidence and it provided the opinion of a well-qualified economist which was not refuted by Defendants' expert; (2) the P/E study itself is the most common valuation technique used by investors; (3) "DHB's restated financials largely alleviate any fear that Professor Harris' model tips too strongly towards the Government;" and (4) "'[t]he calculation of forfeiture amounts is not an exact science,' and . . . the Court need only make a 'reasonable estimate of the loss' using 'general points of reference.'" Id. at 19 (quoting Treacy, 639 F.3d at 48). Note that none of these factors relate to the reliability of the P/E study, but rather they explain why the Court chose not to reject the study in spite of the fact that it is less reliable.

overstatement was approximately half of total inventory overstatement in 2004." (Harris Supp. Aff. ¶ 12.) Defendants aptly state that "[n]ow, even though his new analysis proceeds on the assumption that 50% of his inventory overstatement has been removed, he has kept 83% of that adjustment" and "provides no explanation for this extraordinary disparity." (Brooks Opp. 8.) The Court agrees. And, although the Court did ultimately accept the reduction in Professor Harris's previous analysis,[5] it is not inclined to do so here.

The Court, in its June 14 Order, stated that it was "not entirely comfortable with this discount" and commented that "when Professor Harris runs his P/E study again to exclude just the PACA fraud . . . , his assumptions will reflect something less than a 30% reduction in the P/E ratio." <u>Hatfield</u>, 2011 WL 2446430, at *19 n.17. Professor Harris took it upon himself to make changes to other parts of his analysis based on the Court's statement that his assumptions were too conservative albeit acceptable. Yet, here, when the Court directly criticizes an assumption for being too aggressive and without factual basis

---

[5] Professor Harris testified that if there was no inventory fraud at all, he would have applied a 20% reduction to the P/E ratio, as opposed to the 30% reduction he applied accounting for all inventory fraud. (Tr. 431.) If the inventory overstatement is cut in half, a 25% reduction appears to be justified. However, without any explanation by Professor Harris or the Government as to how or why he calculated forfeiture the way he did, the Court is left guessing. <u>Cf. supra</u> 13 n.3 (stating that details of the revised calculations are never explained).

and states that it should be changed, he fails to adjust accordingly or even explain why his aggressive (and unsubstantiated) stance is appropriate.

Thus, for the reasons explained above, the Court cannot accept Professor Harris's revised calculations. Although the burden of proof is not an onerous one, the Government has failed to satisfy it here.

B.   The Court Will Not Reopen the Record

The Court already reopened the record once as a result of its June 14 Order to allow the Government to submit additional calculations to correct for the PACA inventory issue. Professor Harris's supplemental report, however, as explained above, failed to alleviate the Court's concerns and, in fact, created new ones. The Court will not give the Government yet another opportunity to satisfy its burden.

The Government has already had four opportunities to fix its analysis, specifically the PACA inventory issue: (1) during redirect; (2) when the Government was given the opportunity to recall Professor Harris and offer new calculations; (3) in its post-trial submissions; and (4) as a result of the Court's June 14 Order. Yet after four opportunities, the Government has still failed to offer calculations with which the Court is comfortable. The Court

doubts whether any further opportunities to address the Court's issues with the revised calculations will be fruitful.

Further, the Court does not have the authority to reopen the record, yet again, for either supplemental reports or additional testimony. Generally, a district court has discretion to reopen a criminal case after the close of evidence. See, e.g., United States v. Crawford, 533 F.3d 133, 137 (2d Cir. 2008) (collecting cases). However, this discretion is not limitless, and while no court has addressed reopening the record under these exact circumstances--after the close of evidence and the submission of post-trial briefs in a forfeiture bench trial--courts in the Second Circuit typically require a showing of reasonable justification for the failure to previously offer the relevant evidence prior reopening the record. See, e.g., United States v. Aiken, 373 F.2d 294, 300 (2d Cir. 1967) (holding that the trial court did not abuse its discretion by refusing to reopen a criminal case after the close of evidence but prior to summations for additional testimony when counsel did not adequately account for his failure to locate the witness during the course of the trial); Crawford, 533 F.3d at 138 ("The party moving to reopen [a criminal case after the jury has been charged and begun its deliberations] should provide a reasonable explanation for failure to present the evidence in its case-in-chief."); cf. United States v.

<u>Spitsyn</u>, 403 Fed. Appx. 572, 575 (2d Cir. 2010) ("[N]umerous circuit courts have held that the record on a sentencing remand ordinarily should not be reopened with respect to issues on which the Government had the burdens of persuasion and production[,] [h]owever, circuit courts also have allowed the Government to submit additional evidence on remand if the Government 'tender[s] persuasive reason why fairness so requires.'" (quoting <u>United States v. Johnson</u>, 587 F.3d 203, 213 (3d Cir. 2009) (internal citations omitted)); <u>Romeo v. Sherry</u>, 308 F. Supp. 2d 128, 139 (E.D.N.Y. 2004) (in deciding whether to reopen the record after the close of evidence in a civil bench trial, "'the court must consider (1) whether or not the moving party's failure to submit evidence was the result of its own lack of diligence; (2) the extent to which reopening the record might prejudice the nonmovant; and (3) where the interests of justice lie.'" (quoting <u>John v. Sotheby's Inc.</u>, 858 F. Supp. 1283, 1288 (S.D.N.Y. 1994)). <u>But</u> <u>cf.</u> <u>In re Terrorist Bombings of U.S. Embassies in E. Africa</u>, 552 F.3d 177, (2d Cir. 2008) ("[O]n a motion to reopen a suppression hearing, there is no bright-line rule that necessarily and invariably requires the government to provide a reasonable justification for its failure to offer relevant evidence at an earlier suppression proceeding.").

In the present case, the Government has failed to offer any justification for its inability to (1) present a calculation excluding the PACA fraud during the course of the trial or (2) comply with the Court's June 14 Order to provide revised calculations. In fact, the Government fails to address the substance and adequacy of Professor Harris's revised calculations in its supplemental brief at all. The fact that this Court previously directed the Government to provide supplemental calculations and briefing does not now relieve the Government of its burden to offer a reasonable explanation for failing to offer a comprehensive and accurate analysis prior to the close of evidence. See Crawford, 533 F.3d at 139 ("That the district court played an active role in initiating reopening proceedings does not excuse the government from showing that it had a reasonable explanation for failing to introduce the evidence in a timely manner.").

As such, the Court will not exercise its discretion to reopen the record to allow for supplemental submissions or additional testimony. Having failed to satisfy its burden on multiple occasions, the Government's motion to enter a preliminary order of forfeiture is DENIED to the extent that it seeks forfeiture of any or all of the insider trading proceeds, including Items 106 to 113 listed in Appendix I of the Government's post-trial brief.

III. Unauthorized Compensation Scheme

This does not, however, affect the Court's prior order granting the Government's request for a preliminary order of forfeiture of assets that Brooks obtained through the unauthorized compensation scheme (Items 1 to 85 listed in Appendix I).

## CONCLUSION

For the reasons explained above, the Court GRANTS IN PART AND DENIES IN PART the Government's request for a preliminary order of forfeiture. The Government is directed to submit within seven [7] days of this Order a proposed preliminary order reflecting this Court's decision.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:     September 22, 2011
           Central Islip, New York